# Illinois Official Reports

## Appellate Court

---

## *In re Marriage of Prill*, 2021 IL App (1st) 200516

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF JANE S. PRILL, Petitioner-Appellant, and DAVID R. PRILL, Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>No. 1-20-0516 |
| Filed | September 3, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-D-9311; the Hon. John Thomas Carr, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amanda M. Oliver, Andrew B. Ference, and Bradley P. Erdman, of Weiss-Kunz & Oliver, LLC, of Chicago, for appellant.<br><br>Kurt A. Richter, of Palatine, for appellee. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Justice Walker concurred in the judgment and opinion.<br>Justice Hyman dissented, with opinion. |

**OPINION**

¶ 1      This appeal involves the enforceability of a postnuptial agreement. Petitioner, Jane S. Prill, initiated dissolution of marriage proceedings against respondent, David. R. Prill. David filed a motion seeking to enforce the parties' postnuptial agreement. After briefing and a hearing, the circuit court found that the postnuptial agreement was enforceable and found no just cause to delay enforcement or appeal. Jane appeals, arguing that the postnuptial agreement is both substantively and procedurally unconscionable, and therefore unenforceable. We affirm.

¶ 2      I. BACKGROUND

¶ 3      David and Jane were married in 1994, and their marriage produced four children, one of whom is a minor. David, a CPA, was the primary source of income for the family. Jane worked intermittently outside of the home. Those jobs were short-lived, and she was mostly a stay-at-home mother to the parties' children. In June 2017, Jane informed David that she wanted a divorce. In September 2017, the parties executed a postnuptial agreement and a parenting agreement, which were drafted by David's counsel.

¶ 4      The postnuptial agreement set forth the following terms. Both parties waived maintenance. David agreed to pay, in lieu of maintenance, an "additional property settlement" of $4000 per month for 60 months. David would pay Jane $300,000 in exchange for a quitclaim deed to the marital residence. The parties owned five investment properties; David would keep four, and Jane would keep one. David would keep all the household furnishings in the marital home except for certain kitchen items, Jane's office furniture, and any items that David gifted Jane during the marriage. The parties would keep any funds in accounts held in their own name and would divide equally any funds held in joint accounts. David would keep the parties' two joint investment accounts. Jane would remain as the owner and custodian of trust accounts for their children. Jane got five of the parties' eight vehicles, and David got three. Each party would keep all retirement accounts titled in their own names. David would keep the stock options in his company, Bevolution Group. David waived any ownership interest in Jane's real estate business, Sunhah Properties, LLC, and the funds in Sunhah Properties' business account were to be divided equally between the parties. Each party would keep all personal property and effects in their possession. Each party was responsible for their own attorney fees and for any of their individual debts. David would be responsible for paying for their children's health insurance and would be responsible for 70% of ordinary medical and dental care not covered by insurance. David was fully responsible for the children's college education costs. The agreement also outlined the parties' respective parenting obligations, which are not at issue in this appeal.

¶ 5      There were no asset valuations attached to or incorporated into the postnuptial agreement, no descriptions of any debts owed by the parties, and no mortgages, liens, or other encumbrances on any of the parties' assets. An addendum to the agreement provided that David would transfer one of the rental properties to Jane for a fixed period, with Jane being responsible for all taxes and costs associated with the property, but her interest in the property would terminate if she entered a legal separation or dissolution of marriage before the end of the fixed term.

¶ 6        In November 2017, Jane filed a petition for dissolution of marriage. David answered the petition and filed a motion to enforce the postnuptial and parenting agreement.[1] Jane's written response argued the postnuptial agreement was procedurally and substantively unconscionable, and therefore unenforceable. She argued that David attempted to dissuade her from obtaining her own attorney and threatened to kick her out of the house and cut her off from their children if she did not agree to his terms. She discussed the matter with an acquaintance, attorney Jeffrey Marks, with whom she had worked in her real estate business and who had some prior family law experience. Jane did not retain Marks and he did not represent her in any negotiations. She "reluctantly" signed the postnuptial and parenting agreements. She argued that she felt she had no choice but to sign due to David's threats, and the terms of the agreement unreasonably favored David.

¶ 7        The circuit court held a hearing on David's motion. There is no verbatim transcript of the hearing in the record, but the circuit court certified a bystander's report of the hearing. We will discuss the broad strokes of the hearing and fill in additional facts as needed in the analysis section below.

¶ 8        According to the bystander's report, David gave the following testimony. He did not want the marriage to end. Jane wanted a fresh start, he wanted to give her what she asked for, and her main goal was to be debt free. At some point prior to the execution of the postnuptial agreement, David agreed to give Jane $300,000 to buy a house. He gave somewhat confusing testimony as to the source of funds he used to pay Jane the property settlement and for the purchase of a house. He ultimately testified that, while he borrowed money from his parents after executing the postnuptial agreement, he paid Jane the property settlement from his investment accounts and from a mortgage loan he took out on the marital residence after executing the postnuptial agreement. He and Jane worked together to determine the value of their property and repeatedly met in her home office to discuss financial details. Jane told him in front of their children that she would not touch his retirement accounts. Jane consulted with two attorneys, one of whom submitted revisions, which he accepted. The purpose of the $240,000 property settlement in lieu of maintenance was designed to avoid any tax liabilities. He had stock options in his company, Bevolution Group, but they had no value. He previously told Jane that the stock options were worth approximately $2.3 million, but that was not true. He acknowledged that the liabilities he included in his own balance sheet were incurred after the postnuptial agreement.

¶ 9        Jane gave the following testimony. David was controlling, and she would do what David asked because he would be verbally and emotionally abusive if she did not. While she had various jobs outside of the home during the marriage, they did not last long because David wanted her to stay home and raise their children. David was employed as the chief financial officer for a company and largely handled the family's finances. She obtained her realtor's license during the marriage—at David's urging—to facilitate the parties' investment property ventures. She wanted to negotiate with David and work together without acrimony or prolonged litigation. David bombarded her with charts and proposed allocations of the marital property on an almost daily basis for two months. The parties worked together to create balance sheets of their assets. David's attorney drafted the agreements. She consulted with two

---

[1]Although styled a motion, the circuit court and parties treated David's filing as a claim for declaratory judgment.

attorneys—Margaret Zuleger and Jeffrey Marks—during the parties' negotiations, but David did not want her to hire an attorney, especially one who would change the parties' agreement. Jane testified that Zuleger did not agree to represent her in the negotiations because David asked that Jane only allow Zuleger to rubber stamp the agreement drafted by David's attorney. Jane met with and called Marks numerous times, although she did not consider Marks her attorney. Jane told Marks that he could not make major changes to the agreement because David would not accept them. Both Jane and Marks testified that Marks told Jane not to sign the agreement. Marks was the one who suggested that the agreement be a postnuptial agreement. Jane testified that she and Marks did make changes to the agreement, which David accepted. These included (i) changing the agreement from a Marital Settlement Agreement (MSA) to a postnuptial agreement, (ii) allowing the parties to jointly file their tax returns, (iii) permitting Jane to stay on David's health insurance plan, and (iv) allowing Jane to live rent free in one of the parties' rental properties. Jane felt pressured into signing the agreement. David threatened to kick her out of the marital home and cut her off from their children if she did not sign the agreement. Marks encouraged Jane not to sign the agreement because the terms were unfair, but Marks testified that Jane felt she had to sign to prevent consequences, such as David preventing her from seeing her children. David called her parents during negotiations to pressure her into agreeing to his terms, and he repeatedly asked her to confirm in front of their children that she would not touch his retirement assets.

¶ 10    Both parties submitted demonstrative evidence of the marital estate's value at the time of the postnuptial agreement. Jane submitted a balance sheet, which David agreed was accurate, reflecting the value of the marital estate at approximately $3.8 million. Jane's demonstrative exhibit reflected she received 0.2% of the marital cash and investment accounts, 11% of the value of the parties' real estate holdings, 7% of the value of the parties' retirement accounts, and 27% of the value of the parties' vehicles. The parties also had control of approximately $750,000 in accounts for their children, divided between trust accounts and educational savings accounts for each child. Jane was allocated control over the children's trust accounts—titled in the children's names—holding a total of $246,000, funds that belonged to the children. In sum, Jane's demonstrative exhibit showed she received only 13.5% of the marital estate.

¶ 11    After hearing all the testimony from the parties and considering the parties' written closing arguments and the documentary evidence, the circuit court found the postnuptial agreement was enforceable.[2] The circuit court observed that Jane consulted with Marks, who made changes to the proposed agreement, and David ultimately agreed to those changes; Marks advised Jane not to sign the agreement, but she signed it anyway. The circuit court observed that Jane wanted a "fresh start," she negotiated with David, she knew David would get more of the value of the marital estate, she signed the document outside of David's presence, and she admitted that she did not read the document before she signed it. The circuit court found there was "more than enough to show me that she knew exactly what she was doing. She knew what she wanted, to get out. She knew what she was leaving behind." Although the circuit court agreed that the postnuptial agreement was "not fair," it observed that "not fair does not equal unconscionable if, in fact, she knew what she was doing." The circuit court further observed that while Jane "would have been entitled to substantially more" if she had filed for

_____

[2]The transcript of the circuit court's oral findings was attached as an exhibit to David's response to Jane's motion to reconsider.

- 4 -

divorce, "it was her choice" to sign the agreement. The circuit court found Jane's testimony that she signed the agreement because David threatened to prevent her from seeing her children incredible because she had a lawyer and was "a smart woman" who "knew what she wanted" and knew "what she was leaving behind." The circuit court concluded that the postnuptial agreement was neither substantively nor procedurally unconscionable. The circuit court subsequently granted Jane's motion for finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) and found that there was no just cause to delay an appeal from the order declaring the postnuptial agreement valid. Jane filed a timely notice of appeal.

¶ 12                                II. ANALYSIS

¶ 13       At the outset, we recognize the resolution of this dispute centers on the state of the record before us, which consists primarily of opposing positions advanced by parties in a contested domestic relations lawsuit. Like most property disputes, the circuit court is confronted with conflicting versions of history and reality that must be thoughtfully weighed and considered in rendering its final judgment. In this case, Jane's appeal is essentially founded on the understandable argument that her version of events is correct. The circuit court, however, did not see it that way and ruled against her. Jane does not advance any argument on appeal that the circuit court's factual findings are against the manifest weight of the evidence. Instead, relying on her testimony, Jane argues that the record demonstrates the postnuptial agreement is unconscionable. Applying the circuit court's factual findings, the law, and the rules of appellate review to the arguments raised by the parties, we affirm the judgment of the circuit court.

¶ 14       Jane argues on appeal—as she did in the circuit court—that the circumstances surrounding the formation of the postnuptial agreement, as well as the economic circumstances resulting from the agreement, support a determination that the agreement is substantively and procedurally unconscionable. We disagree.

¶ 15       The law favors the amicable settlement of property rights in marital dissolution cases (*In re Marriage of Morris*, 147 Ill. App. 3d 380, 389 (1986)), and all presumptions are in favor of the validity of the agreement (*In re Marriage of Brandt*, 140 Ill. App. 3d 1019, 1021 (1986)). Our review of a declaratory judgment order depends on the issues involved. *In re Marriage of Kranzler*, 2018 IL App (1st) 171169, ¶ 39. A determination of whether a contract—such as a postnuptial agreement—is unconscionable is a question of law that we review *de novo*. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 99 (2006). We review the circuit court's factual findings under the manifest weight of the evidence standard and will only reverse if the opposite conclusion is clearly apparent. *Kranzler*, 2018 IL App (1st) 171169, ¶ 39.

¶ 16       We have explained that

        "a marital settlement agreement is unconscionable if there is an absence of a
        meaningful choice on the part of one of the parties together with contract terms which
        are unreasonably favorable to the other party. [Citation.] This general definition
        encompasses both procedural unconscionability—involving impropriety during the
        process of forming a contract that deprives a party of meaningful choice—and
        substantive unconscionability—a situation in which a clause or term in the contract is
        one-sided or harsh. [Citation.]" (Internal quotation marks omitted.) *In re Marriage of
        Callahan*, 2013 IL App (1st) 113751, ¶ 20.

- 5 -

¶ 17 "A finding of unconscionability may be based on either procedural or substantive unconscionability, or a combination of both." *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 21 (2006) (citing *Razor*, 222 Ill. 2d at 99); see also *In re Marriage of Labuz*, 2016 IL App (3d) 140990, ¶ 37.

¶ 18 First, Jane argues that the circumstances surrounding the formation of the postnuptial agreement supports a determination that the agreement is unconscionable. This is the same argument raised in and rejected by the circuit court after a hearing and consideration of the testimony and evidence submitted by the parties. She contends that David procured the agreement through "oppressive and dishonest means." During the marriage, David controlled the parties' finances, and Jane never had full access to the parties' accounts, even when they were in her name. While Jane ran Sunhah Properties—the company that managed the parties' investment properties—David prepared the company's financial documents, determined the rental rates to charge, and chose which properties to acquire. David repeatedly urged Jane to quit jobs she took outside of the home so that she could return to her household duties. David continued his "dominion" over the marital estate during the formation of the postnuptial agreement by "creating dozens of charts and allocations, with which he bombarded her almost daily for two months." She understood David would get more than her but claimed she did not understand the extent of the disparity. David threatened to fight Jane on all child-related issues if she did not accept the financial terms. Furthermore, David dictated the degree of involvement he would accept from any attorney she sought to hire.

¶ 19 Procedural unconscionability is fact dependent and typically deals with significant improprieties during the formation of the agreement that deprive a party of a meaningful choice. Those improprieties include, among others, duress (*In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 1082 (1992) ("Duress includes oppression, undue influence, or taking undue advantage of the stress of another to the point where another is deprived of the exercise of free will.")), fraud (*id.* at 1084 (observing that a court should find a settlement agreement unconscionable where a party shields marital assets such that the other party cannot make an informed decision or the trial court cannot make an equitable distribution of property)), interference with a party's ability to secure meaningful legal advice (*id.* at 1081-83), or inconspicuous contract terms and unequal bargaining power (*Razor*, 222 Ill. 2d at 100 ("Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power.")).

¶ 20 Jane primarily relies on *Richardson*, 237 Ill. App. 3d 1067, to support her argument that the conditions surrounding the formation of the postnuptial agreement support a finding of unconscionability. *Richardson*, however, is distinguishable. There, the petitioner, Edward, sought a declaration that his postnuptial agreement with respondent, Irene, was valid, whereas Irene argued, in part, that the agreement was unconscionable. *Id.* at 1068-69. The record established that, at the time of the postnuptial agreement, Irene did not want the marriage to end. Roughly eight months before the agreement was signed, Irene's father was diagnosed with cancer, requiring frequent hospitalizations. Irene spent a great deal of time at that hospital and the impact of her father's illness affected her mental state. *Id.* at 1081. The agreement was executed just one week after her father died. *Id.* Although it was clear Edward intended to divorce Irene, he regularly told her they would be a family again and their agreement included a two-year moratorium on pursuing a divorce to induce her to sign the agreement. *Id.* at 1082.

Furthermore, Irene's attorney advised her not to sign the agreement, but Edward interfered and enlisted his company's attorney, Scott Hodes, to find Irene another attorney. *Id.* at 1081. Hodes contacted a former associate, David Passman, and said there was already an agreement in place, the matter needed to be dealt with quickly, and Edward would pay Passman's fee. *Id.* Passman had very little experience in matrimonial law, "spent only 20 minutes reviewing the financial information relative to the balance sheet, made no inquiry as to whether the Richardson Electronics stock was marital or nonmarital, and did not ask for any further documents or financial information to verify any of the entries on the balance sheet." *Id.* at 1083. There was also evidence that just 10 days before the agreement was signed, Irene was "crying and upset and stated that she did not want the divorce." *Id.* at 1082. We found "that Irene labored under an extraordinary amount of duress at the time the agreement was executed, sufficient to warrant our setting aside the agreement as unconscionable." *Id.*

¶ 21 Here, unlike in *Richardson*, the circuit court considered the testimony of both parties and found that Jane wanted the marriage to end because she wanted a fresh start. Although Jane testified David dissuaded her from obtaining counsel who might vigorously protect her interests in the marital estate, the circuit court, having heard Jane's version of seeking legal representation, found Jane still had the choice of securing counsel, but she chose not to. Both Jane and Marks testified that Marks advised Jane to not sign the agreement, but she signed anyway because she wanted to complete the agreement so she could move out of the house and end the marriage. Jane offered no evidence tending to show she lacked a meaningful choice in deciding whether to obtain counsel.

¶ 22 Furthermore, the circuit court found Jane's testimony that she signed the agreement because David threatened to prevent her from seeing her children was not credible. Instead, the circuit court found there was ample evidence showing Jane wanted to get out of the marriage and be on her own. On appeal, Jane does not question this finding. The record does not demonstrate the circuit court's finding—that Jane's desire to end the marriage was the overriding consideration in her signing the postnuptial agreement and not that she signed the agreement under duress—is against the manifest weight of the evidence. To the extent Jane sought to prove duress as part of her unconscionability argument, it was her burden to establish by clear and convincing evidence that she was " 'bereft of the quality of mind essential to the making of the contract.' " *Kranzler*, 2018 IL App (1st) 171169, ¶ 78 (quoting *In re Marriage of Hamm-Smith*, 261 Ill. App. 3d 209, 215 (1994)). Here, the circuit court found there was insufficient evidence of duress and, again, Jane did not meet her burden of establishing duress. Jane argues that David "threatened to fight [her] on all child-related issues unless she agreed to his financial terms." But that threat could not rise to the level of duress to show she was " 'bereft of the quality of mind essential to the making of the contract.' " *Id.* (quoting *Hamm-Smith*, 261 Ill. App. 3d at 215). Dissolution of marriage cases frequently involve contested child-related issues, and stress and anxiety are common emotional reactions, but a threat of legal action where there is a good faith belief that a meritorious cause of action exists is not actionable duress. *Kaplan v. Kaplan*, 25 Ill. 2d 181, 187 (1962).

¶ 23 After consideration of all the evidence, the circuit court rejected Jane's arguments surrounding the formation of the agreement and specifically found that Jane did, in fact, have a meaningful choice in signing the agreement. Given Jane's failure to contest the circuit court's factual findings and considering all the factors surrounding the execution of the postnuptial agreement the circuit court weighed, we cannot say the circuit court erred in rejecting Jane's

claim that she lacked a meaningful choice in signing the agreement. Thus, the circumstances here do not support a finding of procedural unconscionability.

¶ 24 Next, Jane argues that the relative economic circumstances resulting from the postnuptial agreement supports a determination that the agreement is substantively unconscionable. Again, this argument was made in, and rejected by, the circuit court. She asserts that the marital estate had a value of $3.8 million but the postnuptial agreement only allocated her approximately $820,000, $247,000 of which was in trust accounts for their children. She argues that the agreement did not provide her with a residence, left her with virtually none of the parties' cash, and allocated her inadequate retirement savings. She also contends that stock options in David's company were allocated entirely to him, which—in her view—are worth $2.3 million.

¶ 25 A substantive unconscionability analysis requires that the contract be "so unfair that the court cannot enforce it consistent with the interests of justice." *Phoenix Insurance Co. v. Rosen*, 242 Ill. 2d 48, 60 (2011). However, not every "unfair" agreement is substantively unconscionable. See *id.* at 75-76. Here, we are not persuaded that the terms of the agreement support a finding of substantive unconscionability; while there is an obvious imbalance in the marital assets each party received, we cannot find this imbalance amounts to substantive unconscionability.

¶ 26 In the circuit court, the parties were in relative agreement that David's share of the marital assets under the terms of the agreement resulted in David receiving more than 99% of the parties' cash and investment accounts—roughly $470,000—while Jane received only $1100. David received 93% of the parties' retirement accounts—roughly $800,000—while Jane only received around $59,000. David received 89% of the parties' real estate—valued at around $1.48 million—while Jane got one property worth $180,000. Jane got five of the parties' eight vehicles, but only 27% of the total value of those vehicles. Jane became the custodian for the children's trust accounts valued at $246,000, but that money was the children's, not hers, while David retained over $500,000 in educational savings accounts for the children. Jane received $330,000 in payments for a house and furniture and was to receive a $240,000 property settlement in lieu of maintenance. All told, Jane contends she received possession or control of 28% of the marital estate, excluding consideration of the stock options in David's company, the value of which is unclear and has not been established by Jane. See *infra* ¶ 28.

¶ 27 We note that David's appellate brief argues that he incurred liabilities after the execution of the agreement, including borrowing money from his family, taking out a mortgage on the marital residence, and structuring the property settlement payment so that Jane would avoid having to pay income tax. His theory is that, when factoring in these liabilities, the economic circumstances of the parties shift dramatically. But much of the argument section of David's appellate brief is devoid of citations to the record on appeal or to authority to support his contentions, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018). And in the circuit court, he did not present any documentary evidence to corroborate the existence or value of the family loans or mortgage. David has therefore failed to present any authority to support his argument that those liabilities should be factored into the overall allocation of marital assets flowing from the postnuptial agreement. Consequently, we will not consider this argument, and it will not factor into our decision.[3]

---

[3]We also note that David included a "Net Worth Balance Sheet Summary" on page 14 of his appellate brief purporting to summarize the parties' assets and liabilities. This purported balance sheet

¶ 28    The parties dispute the value of David's stock options in Bevolution Group. The value of these options would likely have a significant impact on the parties' respective economic circumstances following the agreement. There is no dispute the stock options are marital property, and under the agreement, David would retain the options. But there is little evidence in the record to support either party's valuation, and nothing in the record reflects that Jane sought to establish the value of the options or sought a value determination from the circuit court. The only evidence of the value of the options was (1) a text message from David to Jane, in which he stated that the options were worth roughly $2.3 million, and (2) David's testimony that the value in the text message was a lie and the stock options were worthless. There was documentation submitted below outlining the stock option terms, but there were no expert opinions offered that might shed light on how to value the stock options as part of the marital estate. The circuit court had no evidence to assist in its valuation, if any, of the stock options, which in turn means we clearly have no basis from which to determine whether the stock options have any past, current, or future value. Consequently, we have no basis from which to conclude that David's retention of those options should be considered when evaluating the conscionability of the agreement. Therefore, we will rely on the record presented to and considered by the circuit court to assess whether the agreement was substantively unconscionable.

¶ 29    Jane again relies on *Richardson* and *Callahan* to argue that the agreement is substantively unconscionable. We are not persuaded that those cases support a finding of substantive unconscionability here.

¶ 30    In *Richardson*, Irene received $10,000 per month in maintenance with built-in cost of living adjustments, payments for her college education, support and college education for the parties' children, a new luxury vehicle, and title to a residence in Barrington worth $1 million. *Richardson*, 237 Ill. App. 3d at 1083. But the residence needed $400,000 in repairs, for which Irene was required to reimburse Edward. Edward, however, received all the remaining marital assets, including all the stock in his company. *Id.* The circuit court found that Edward undervalued the stock at $10.4 million, when it was more likely valued at around $41 million. *Id.* We found the agreement was substantively unconscionable, given that Irene only received 7.55% of the value of the marital estate. *Id.*

¶ 31    In *Callahan*, we found a marital settlement agreement substantively unconscionable where the petitioner, Michael, and the respondent, Rosemary, divorced after 29 years of marriage. 2013 IL App (1st) 113751, ¶¶ 1-3. Rosemary timely filed a section 2-1401 petition alleging the parties' MSA was unconscionable because Michael fraudulently misrepresented the contents of the agreement to her and Michael's counsel made misrepresentations of law and fact at the original prove-up hearing. *Id.* ¶ 8. The MSA provided that Michael would pay Rosemary $2500 in monthly maintenance for 14 years, after which Rosemary could petition for renewal of maintenance, but the renewal could not exceed $2500 per month. *Id.* ¶ 6. Michael would continue to pay for Rosemary's health insurance for four years. *Id.* ¶ 4. Michael would keep the marital residence, and both parties would retain any retirement accounts they

was not included in the record on appeal. Illustrative exhibits in the body of appellate brief may in some situations help this court understand an aspect of a party's argument, but such illustrative exhibits must be supported by citations to the record on appeal (see Ill. S. Ct. R. 341(h)(6), (7) (eff. May 25, 2018)) to avoid the risk of misleading or confusing this court on factual matters.

had. *Id.* ¶ 6. Michael had a pension and a deferred compensation account, while Rosemary, a homemaker, had no retirement accounts. *Id.* Michael's counsel incorrectly informed the trial court that the marital residence had become Michael's nonmarital property. Michael also assumed responsibility for $100,000 in marital debts. *Id.* ¶ 7. Michael's counsel also told the circuit court that Michael's retirement account was worth roughly the same amount of debt he was assuming. *Id.* Rosemary's section 2-1401 petition asserted, however, that the marital residence was marital property with net equity of $175,000 and Michael's pension plan was worth nearly $1.5 million, and she provided documentation to support her claims. *Id.* ¶ 8. She further asserted Michael induced her to sign the MSA by telling her that the agreement benefitted her, and she could not read the MSA herself due to complications from medications she took for fibromyalgia and bipolar disorder. *Id.* ¶ 9. We agreed with the circuit court that the MSA was unconscionable as a matter of law, given that Michael received virtually the entire marital estate—including the marital home and all the parties' retirement savings—while Rosemary only received maintenance and health insurance coverage. *Id.* ¶ 23. We also concluded there was clear evidence of fraud. *Id.* ¶ 24.

¶ 32        The case before us is unlike the situation in *Callahan*, where there was clear evidence of fraud and Michael received almost the entire marital estate in exchange for Rosemary receiving monthly maintenance payments and health insurance coverage. Here, Jane received roughly a quarter share of the marital estate's value, including cash for a house, a tax-free property settlement, five vehicles, and some retirement savings. Likewise, this case is distinguishable from *Richardson*, where Edward, among other things, materially misrepresented the value of the stock in his company. Here, there is no evidence in the record to support any true valuation of David's stock options; thus, we cannot conclude they affect the property division between the parties.

¶ 33        The agreement here favors David. Having reviewed the evidence considered by the circuit court regarding the agreement's economic impact on Jane, we cannot say the circuit court erred in finding the agreement was not "so unfair that the court cannot enforce it consistent with the interests of justice." *Rosen*, 242 Ill. 2d at 60. The circuit court properly exercised its discretion in considering the evidence, assigning whatever weight to that evidence it deemed appropriate, and, finally, in assessing the credibility of the witnesses in finding the parties' postnuptial agreement enforceable.

¶ 34                                    III. CONCLUSION
¶ 35        For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 36        Affirmed.

¶ 37        JUSTICE HYMAN, dissenting:
¶ 38        If left to stand, this case sets a precedent imperiling the prospects of an equitable postnuptial agreement for the financially insecure spouse. A financially insecure spouse now will have a heavier burden to show substantive and procedural unconscionability. This represents a step backward for gender equality, as it principally affects women.

¶ 39    The majority's analysis mischaracterizes the substance of Jane's appeal "as essentially founded on the understandable argument that her version of events is correct." Respectfully, this view misapprehends Jane's briefs.

¶ 40    In finding Jane failed to establish procedural or substantive unconscionability, the majority acknowledges, and then disregards, damning facts. The factual findings establish, among other manipulations, that David (i) prevented Jane from engaging an attorney to provide her meaningful and informed legal representation, (ii) threatened Jane on "all child-related issues" if she rejected his terms, (iii) jeopardized Jane's relationship with her children, (iv) limited Jane's access to accurate information about their finances, (v) exerted complete control of the couple's finances and accounts during the marriage, (vi) bullied Jane into believing that the alternative would be a lengthy and messy divorce proceeding, (vii) urged Jane to attend to the home during the 23-year marriage, (viii) mentally and emotionally tormented Jane, (ix) cowed Jane regarding her financial well-being, and (x) bombarded Jane "almost daily for two months" to sign the agreement.

¶ 41    In sum, David carried out economic and social subjugation, wielded mental and emotional dominance, and engaged in negotiation tactics meant to ensure unfair treatment.

¶ 42    Still, according to the majority, Jane made an informed and voluntary choice.

¶ 43    Like the trial court, the majority places great weight on Jane wanting the divorce. I strenuously disagree with my colleagues that it has any relevance at all.

¶ 44    Moreover, the majority gives short shrift to David's verbal, mental, psychological, and financial abuse and narrowly construes the traditional factors used in postnuptial decisions.

¶ 45    Finally, I propose a more objective and specific framework for assessing postnuptial agreements.

¶ 46                                    A. Additional Facts

¶ 47    The trial court and the majority acknowledge that the agreement is unfair to Jane but miss the obvious: the postnuptial agreement was not the result of bilateral and multi-issue negotiations. Examples abound.

—Jane testified that David relentlessly pressured her to sign.

—David's attorney drafted the agreement, but David thwarted Jane's ability to retain an independent attorney. Jane testified that the lack of meaningful counsel hampered her ability to make sense of the agreement.

—When Jane informed David in June 2017 that she wanted a divorce, David inundated her with charts, documents, and other financial information. He vowed that his attorney's agreement would be the best she would ever get from him. And it was.

—David used the children as leverage. He insisted he would fight Jane on child-related issues and, in front of the children, repeatedly sought her promise that she would not touch his retirement assets.

—David used calls to Jane's parents to spur her consent.

—David pressed Jane financially by canceling their joint credit card. A stay-at-home mother throughout the marriage, Jane testified that when she finally signed, she was unable to support herself without David's assistance.

—David bombarded Jane with information on the parties' finances, about which she testified she had little understanding. Contrary to David's portrayal, Jane said David controlled the parties' investment and retirement accounts, children's savings accounts, and real estate investment portfolio.

—David put accounts into Jane's name solely for tax purposes. Jane testified she did not have full access to most accounts. David set up a real estate business, Sunhah Properties, to manage the parties' rental and investment real estate holdings. Although it was ostensibly Jane's business, David instructed Jane on preparing the business tax returns and other documents. He made all major decisions, including what properties to buy and rent to charge.

—While Jane knew that David would get more of the assets, she did not know the extent of the split or that she would receive such a low percentage of the marital estate. Specifically, she thought she was getting 45% of the marital estate.

—Jane did not understand all the terms and assumed David's agreement conformed to the balance sheets David had shown her. But, as she later learned, David falsified the balance sheets.

—Jane relied on David's false statement that he would always financially care for her and take full responsibility for the children's expenses.

¶ 48 The majority has no issue with the trial court's finding that "Jane still had the choice of securing counsel, but she chose not to," adding "Jane offered no evidence tending to show she lacked a meaningful choice in deciding whether to obtain counsel." *Supra* ¶ 21. Actually, the record contains ample evidence to the contrary.

¶ 49 Jane decided to hire Margaret Zuleger as her counsel, but David forbid Zuleger from making any changes. He asked Jane, "Are there going to be any problems? By problems, I mean changes," and told her, "[i]f Margaret is going to talk you out of our agreement or stir up the pot, then we need to figure something else out." David held firm—Zuleger could not raise substantive changes, period. Naturally, Zuleger declined to represent Jane under these circumstances. Indeed, no competent attorney would have agreed to David's terms, denying Jane the attorney of her choosing.

¶ 50 We know, too, that David sent Jane a text regarding a replacement for Zuleger, "If you get a new attorney and we start to retrade [*sic*] the agreement then we can both plan on buckling up for a long, expensive process with kids['] living arrangements remaining *status quo*. Please keep in mind that you asked for this, not me." David suggested that Jane speak to a real estate attorney she knew, Jeffrey Marks. David texted Jane, "[a]ll [Marks] needs to do is look over what I sent you last night which you already reviewed." As with Zuleger, Jane testified that Marks could not make substantive changes because David would refuse them outright.

¶ 51 Marks testified that, although he did not represent Jane, he suggested a few minor, nonsubstantive restyling edits. Even though Marks told Jane not to sign David's draft, Jane replied that she could not remain under the same roof with David and so had no choice except to sign.

¶ 52 Jane acknowledged David never "touched her in anger" but that his history of verbal and emotional abuse "trained" her to know what would happen if she crossed him. She wanted out of the marital residence, out of David's constant control.

¶ 53        Jane testified she felt she *had* to agree to the terms of David's agreement to get away from David and to protect her relationship with her children. Recall, David admonished that should Jane not sign, he would prevent her from seeing the children. Marks corroborates this testimony.

¶ 54        Further evidence of David's intentions and mindset arises from messages David texted Jane after filing this lawsuit. David proclaimed Jane would "have nothing when this is done." And "You picked a fight with the wrong person—you should know me well enough by now to realize I don't back down from a fight ***. I have a call into your parents so they are aware of what [you're] tying [*sic*] to pull." Also, "Im [*sic*] splattering your greed to our family members because when the bloodshed begins everyone is well aware of who is responsible for this." David told their children Jane was a "liar," a "gold digger," "vindictive," and "resentful," and he would seek full custody of their minor son because "[Jane] was not any good for him."

¶ 55        Echoing David's testimony, the majority states that Jane wanted the divorce, and David "wanted to give her what she asked for, which was enough for her to have a fresh start with no debts." But the majority does not mention that the trial court acknowledged that David was likely dishonest about wanting to stay married. The trial court said David "professed *** in some of the e-mails and professed on the stand he still loved her and he wanted to stay married to her, but I kind of believe *** that was just on the financial aspect of things."

¶ 56        The majority opinion shades other facts. For instance, saying "Jane consulted with two attorneys" (*supra* ¶ 8) leaves the false impression that she had independent legal counsel during the negotiations. Similarly, saying David testified that "Jane told him in front of their children that she would not touch his retirement accounts" (*supra* ¶ 8) ignores David's constant pressuring of Jane in front of the children.

¶ 57        Then there is the trial court's insistence, which the majority adopted, that "Jane knew exactly what she was doing. She knew what she wanted, to get out." The majority notes that Jane "does not question" the trial court's "finding" that she asked for the divorce. The majority then concludes that it was not against the manifest weight of the evidence because "Jane's desire to end the marriage was the overriding consideration in her signing the postnuptial agreement." *Supra* ¶ 22. What relevance does "Jane's desire to end the marriage" have to unconscionability? The majority does not say. How does this finding bear on the question of unconscionability? Again, the majority does not say.

¶ 58        Procedural unconscionability means an absence of a meaningful choice; that one party has no realistic chance to bargain. See *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 775 (2007). Substantive unconscionability refers to the terms of the agreement benefiting one side more than the other without justification. *Id.* at 777. Neither involves taking account or factoring a party's motivation for wanting an agreement.

¶ 59        In a non sequitur, the majority notes that Jane made the same arguments before the trial judge who "rejected [it] after a hearing and consideration of the testimony and evidence submitted by the parties." *Supra* ¶ 18. The majority repeats this hollow fact elsewhere. See *supra* ¶ 24 ("Again, this argument was made in, and rejected by, the circuit court."); *supra* ¶ 28 ("we will rely on the record presented to and considered by the circuit court to assess whether the agreement was substantively unconscionable"). In just about every case before this court, a party has made "the same argument" that the trial judge "rejected," following "a hearing and consideration of the testimony and evidence submitted by the parties."

¶ 60    Aside from Jane's desire to end the marriage—which, as discussed, is irrelevant—Jane's testimony about the intense pressure David placed on her was credible. Ample evidence supports it, including David's numerous text messages.

¶ 61    Furthermore, David's credibility came under fire repeatedly and on substantive matters. For instance, David testified that he took out several loans to pay Jane her property settlement, including a loan from his father and a mortgage against the marital residence. Yet, David presented no documentary evidence of loans. On cross-examination, David admitted that no mortgages were on the parties' real estate when they signed the agreement.

¶ 62    In addition, David presented Exhibit 10, which he said he prepared specifically for the hearing and claimed as a list of the parties' assets and liabilities on the date of the agreement's execution. Nothing in the record corroborates that. And, although David's brief reproduces Exhibit 10, his attorney admitted during oral argument that the parties had no liabilities at the time. In other words, before both the trial court and this court, David's counsel presented a fabricated document. David also testified that his text message to Jane on his stock options' worth of $2.3 million was a lie, although he produced no documents indicating one way or another.

¶ 63    The majority concludes that Jane failed to question the trial court's factual finding that her desire to end the marriage "was the overriding consideration in her signing the postnuptial agreement" (*supra* ¶ 22), so "we cannot say the circuit court erred in rejecting Jane's claim that she lacked a meaningful choice in signing the agreement" (*supra* ¶ 23). Not so. While Jane does not address this irrelevant fact, her brief argues factors pertinent to unconscionability.

¶ 64    Moreover, though we will not reverse the trial court's factual findings unless they are against the manifest weight of the evidence, procedural unconscionability is reviewed *de novo*. *Tabassum*, 377 Ill. App. 3d at 777. Regardless, the record makes plain that David's tactics to secure Jane's signature were unconscionable.

¶ 65                    B. Additional Factors for Assessing Unconscionability

¶ 66    Applying general contract principles, the majority considers five factors in assessing unconscionability: (i) duress, (ii) fraud, (iii) interference with a party's ability to secure meaningful legal advice, (iv) inconspicuous contract terms, and (v) unequal bargaining power. I agree that these factors typically apply. As noted, I disagree that these factors weigh in favor of enforcing the agreement.

¶ 67    I also disagree that these factors adequately assess unconscionability in the context of assessing a postnuptial agreement. The factors collectively leave out consideration of the fiduciary relationship between husband and wife. See *Nessler v. Nessler*, 387 Ill. App. 3d 1103, 1111 (2008) ("fiduciary relationship may arise in a marital relationship as the result of special circumstances of the couple's relationship, where one spouse places trust in the other so that the latter gains superiority and influence over the former"). Also, they ignore unique characteristics involved in postnuptial negotiations.

¶ 68    I suggest an examination of 10 factors: (i) a meaningful opportunity to retain independent counsel, (ii) threats regarding children, marital assets, and prolonged litigation in the absence of agreement, (iii) duress, fraud, overreaching, misrepresentation, deception, or nondisclosure of material facts, (iv) disparity in earning power, (v) control of finances, (vi) full and accurate disclosure by each party of liabilities and assets, (vii) each party's understanding of and free

agreement to the terms, (viii) length of marriage, (ix) physical or emotional abuse, and (x) disparity in allocation of marital assets and debt. As with the majority's five factors, no one factor should be dispositive. Rather, a court should weigh the factors in determining unconscionability of a postnuptial agreement.

¶ 69     Applying these factors leads to a single conclusion: the postnuptial agreement is both procedurally and substantively unconscionable.

¶ 70                          I. Independent Attorney

¶ 71     Fairness depends on each spouse retaining independent counsel of his or her choice. Representation by independent counsel has historically been a critical factor in assessing unconscionability. Compare *Tabassum*, 377 Ill. App. 3d at 775-77 (upholding agreement, court determined wife had access to and use of independent counsel during formation and execution of agreement), with *In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 1082-83 (1992) (husband had his attorney procure counsel with little matrimonial law experience for wife).

¶ 72     The trial court found, and the majority adopts, that Jane had the choice of securing counsel and chose not to. According to the majority, "Jane offered no evidence tending to show she lacked a meaningful choice in deciding whether to obtain counsel." *Supra* ¶ 21. This conclusion belies the evidence.

¶ 73     David refused to allow Jane to retain her own attorney, let alone an attorney, like David's, practicing family law and able to provide meaningful, independent advice and pursue material changes benefiting Jane.

¶ 74     As noted, David told Jane she could not retain Margaret Zuleger if Zuleger would change a word. Jane told Zuleger she could only rubberstamp David's agreement. Not surprisingly, Zuleger declined to represent Jane. David, alternatively, told Jane she could consult with an attorney recommended by his attorney, stating, "it would go much smoother if you worked with [S]andy who is in his building." Knowing Jane was anxious to end the marriage, David suggested that Sandy "will help us get this done" instead of derailing it, an acknowledgment that David knew that independent counsel would never let Jane agree to his material terms.

¶ 75     Then, at David's behest, Jane met with Jeffrey Marks. Jane had dealt with Marks as an attorney in real estate transactions. When Jane said she wanted to hire a different attorney, David texted her the following:

>     "Don't bother hiring another attorney—it will only result in further delays and cost more money. All [Marks] needs to do is look over what I sent you last night which you already reviewed. Kurt [David's lawyer] had Jeff's contact information and he is planning on contacting him later today after you and Jeff speak and he answers your questions."

Knowing Jane wanted to end the marriage and get out of the marital residence, David warned her that if she retained a different attorney, the process would be long, drawn-out, and expensive.

¶ 76     Again, David's threats deprived Jane of retaining an independent attorney of her choosing. Although Marks reviewed David's agreement for a few hours one evening at a bar and recommended minor edits, Jane did not retain Marks, and Marks testified he never had an attorney-client relationship with her.

¶ 77  Marks spoke to Jane as a friend, not as an attorney to a client, so she did not receive the benefits of an attorney-client relationship, including an attorney's independent professional judgment and deliberative advice. See Ill. R. Prof'l Conduct (2010) R. 2.1 (eff. Jan. 1, 2010); see, *e.g.*, *People v. Gionis*, 892 P.2d 1199, 1208 (Cal. 1995) (the fact that an attorney spoke to defendant as friend, rather than in professional capacity, supported finding no attorney-client relationship).

¶ 78  Faced with the same restrictions as Zuleger, Marks simply told Jane what any attorney would—do not sign.

¶ 79  The trial court and the majority give great weight to this statement. Still, Jane never received independent professional counsel or deliberative advice. Unmentioned is that David had Jane in a corner—she had to sign the agreement if she wanted to get out of the house and away from David's control. As Jane told Marks, "consequences" would follow if she did not sign, especially David preventing her from seeing the children.

¶ 80  Contrary to the majority's conclusion, Jane had no "meaningful choice" regarding representation. Indeed, David had counsel throughout, adding mightily to the disparity in bargaining power. See *Tal v. Tal*, 601 N.Y.S.2d 530, 535 (Sup. Ct. 1993) (invalidating agreement partly due to wife having no representation and husband's attorney drafting agreement).

¶ 81              II. Threats Regarding Children, Marital Assets,
                 and Prolonged Litigation in Absence of Agreement

¶ 82  The record demonstrates that David repeatedly threatened Jane with access to the children, financial support, and prolonged litigation. For example, David often discussed the agreement with the children and made Jane promise in front of the children that she would not touch his retirement assets. And to pressure her, David called Jane's parents during negotiations, made disparaging remarks about her, and sent her text messages saying that he told her parents about the pain she was inflicting on him and the children. In addition, David canceled the joint credit card after Jane refused to agree to his financial terms. To all of this, the trial court and the majority shrug.

¶ 83  During postnuptial negotiations, parties often struggle with overwhelming emotions, pain and hurt, loss and change, shame and regret, and the erosion of love. Courts must recognize the unique context in which postnuptial negotiations take place. But the opposite occurred here. The trial court likened the "negotiations" between Jane and David to buying a car, stating, "[i]f you see a car that you really like but you see that it's overpriced but you just can't resist buying it, you can't complain after buying it that it was too expensive." Postnuptial negotiations have no resemblance to negotiating the purchase of a car. Threats must be taken seriously.

¶ 84              III. Duress, Fraud, Overreaching, Misrepresentation,
                 Deception, or Nondisclosure of Material Facts

¶ 85  As the majority notes, this court held duress sufficient to render an agreement between spouses unconscionable. *Richardson*, 237 Ill. App. 3d at 1082. "Duress includes oppression, undue influence, or taking undue advantage of the stress of another to the point where another is deprived of the exercise of free will." *Id.*

¶ 86    As to duress, the trial court found not credible Jane's testimony that she signed the agreement because of David's threats to prevent her from seeing her children. "Instead, the circuit court found there was ample evidence showing Jane wanted to get out of the marriage and be on her own." *Supra* ¶ 22. The majority asserts that Jane "does not question this finding" and the finding was not against the manifest weight of the evidence. According to the majority, "Jane's desire to end the marriage was the overriding consideration in her signing the postnuptial agreement." *Supra* ¶ 22. In every divorce, at least one spouse asks to end the marriage. Placing any evidentiary weight on this consideration constitutes error requiring reversal.

¶ 87    Surely, the desire to end a marriage and coercion are not mutually exclusive, and the existence of coercive abuse can be an impetus for ending a marriage. But, as the facts attest, in entering into the postnuptial agreement, Jane could not exercise her own free will. It is disingenuous to pretend otherwise.

¶ 88    A postnuptial agreement was found unconscionable due to duress in *Richardson*. Significantly, the majority tries to distinguish *Richardson* on a most dubious basis. In *Richardson*, the wife did not want the marriage to end and was distraught. Shortly before signing the agreement, she was "crying and upset and stated she did not want the divorce." Conversely, here, the trial court found that "Jane wanted the marriage to end because she wanted a fresh start." Apparently, the majority would have followed *Richardson* had David wanted the divorce.

¶ 89    Overlooked by the majority is the essence of the *Richardson* decision—the husband's outsized role in thwarting his wife's efforts to retain an attorney and the continued onslaught of pressure on the wife. See *Richardson*, 237 Ill. App. 3d at 1071. Also, in *Richardson*, the wife ultimately signed a one-sided agreement to escape a controlling husband. *Id.* at 1076. Thus, the decision in *Richardson* turns not on the wife's wanting to save the marriage but on the husband's exploitation of his wife's emotional turmoil, the same behavior on display here.

¶ 90    In its attempt to distinguish *Richardson*, the majority creates a standard of unconscionability that depends on who most wants the marriage to end. But what about Jane's situation, where David holds all the bargaining power?

¶ 91    As the majority notes, procedural unconscionability involves improprieties during the forming of the agreement that deprives a party of meaningful choice. *In re Marriage of Callahan*, 2013 IL App (1st) 113751, ¶ 20; *In re Marriage of Mitter*, 2015 IL App (1st) 142695 ¶ 8. When Marks told Jane not to sign, she said she had no choice and had to get out of the home and away from David's grip. Yet, under the majority's reasoning, while dealing with threats, ultimatums, and psychological cruelty—including the possible loss of access to her children—Jane had a choice: (i) sign the unfair agreement without independent legal counsel or substantive negotiations, (ii) leave the marital residence financially strapped and risk losing access to her minor son, or (iii) stay in an untenable marriage. To say this amounts to meaningful choice mocks reality.

¶ 92    Relying on *Kaplan v. Kaplan*, 25 Ill. 2d 181 (1962), the majority contends that David's threats to seek sole custody of their minor son did not amount to coercive conduct. The court in *Kaplan* held that a threat of legal action made in good faith is not actionable duress. *Id.* at 187. But *Kaplan* has no application here at all. *Kaplan* involved a threat of legal action by a wife against a woman with whom her husband had taken compromising photographs (*id.* at 184), not repeated threats to prevent a mother from seeing her children if she did not agree to

settlement terms. Moreover, nothing in the record suggests that David's threats were in good faith. Once Jane signed, the threats regarding the children stopped until she challenged the enforceability of the agreement. That's when David renewed the threats to seek full custody of their minor son.

¶ 93    Furthermore, a settlement agreement procured fraudulently or by fraudulent concealment will not be upheld. To sustain a showing of fraud, a party must prove (i) a false statement of material fact, (ii) known or believed to be false by the party making it, (iii) intent to induce another party to act, (iv) action by the other party in reliance on the truth of the statement, and (v) damage to the other party relying on such statement. *In re Marriage of Morris*, 147 Ill. App. 3d 380, 393 (1986). The misrepresentation or concealment of facts from the court has been held sufficient to support vacating a judgment on the grounds of equity. *Callahan*, 2013 IL App (1st) 113751 ¶ 24 (citing *In re Marriage of McGlothlin*, 312 Ill. App. 3d 1145, 1148-49 (2000)).

¶ 94    The majority attempts to distinguish *Callahan*, due to clear evidence of fraud, and *Richardson*, where the husband grossly misrepresented the value of his company's stock, concluding that no evidence in the record supports a proper valuation of David's stock options. Therefore, the majority says, "we cannot conclude they affect the property division between the parties." *Supra* ¶ 32. That, however, is not the only evidence of deception. David testified that the stock options had no value, but the text messages show he told Jane they were worth $2.3 million. Further, in the trial court and before this court, David knowingly presented false evidence in an attempt to show he had liabilities. Although not definitive of fraud, this goes to David's deceptive conduct regarding the parties' finances.

¶ 95                                IV. Disparity in Earning Power

¶ 96    A disparity in income and earning power between the parties can establish an unconscionable postnuptial agreement. See *In re Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 35 (holding division of assets one-sided and oppressive in light of parties' disparity in income, unequal earning potential, and lack of maintenance award). David, a CPA and CFO, earned over $200,000 a year. Jane worked sporadically during the 23-year marriage and quit several jobs after short stints because David wanted her to be a stay-at-home mother. Jane obtained a real estate license in 2015 at David's urging so she could act as a realtor on his investment property. Jane did not start regularly working as a real estate agent until 2017, when she filed for divorce. As a result, when Jane signed the agreement, she could not support herself without David's help. No one can seriously dispute that David's earning power vastly exceeded Jane's.

¶ 97                             V. Control of Finances During Marriage

¶ 98    One spouse's control of the parties' finances during a marriage to the exclusion of the other spouse can be evidence of unconscionability. See, *e.g.*, *Tal*, 601 N.Y.S.2d at 535 (voiding agreement, in part, because husband had complete control of all marital assets and income). The controlling spouse may use superior knowledge about the marital estate as leverage and prevent the objecting party from fully understanding the terms of the agreement. *Id.*

¶ 99    David controlled the parties' finances, including their investment accounts, children's savings accounts, real estate holdings, and even Jane's retirement accounts. Although Jane's name appears on some of the accounts for tax purposes, she never had full access to them and

only superficially knew what they entailed. David also controlled Jane's part-time work as manager of their real estate portfolio by preparing all the financial documents, determining the rental rates, and acquiring properties. David displayed this control in the two months before Jane signed, bombarding her with charts, documents, and figures about their finances nearly nightly. Thus, based on his background as a CPA and superior access to the marital accounts, David maintained complete dominion over the marital estate.

¶ 100                    VI. Full Disclosure of Assets and Liabilities

¶ 101    A spouse's failure to provide full disclosure of assets and liabilities indicates unconscionability. See *In re Marriage of Roepenack*, 2012 IL App (3d) 110198, ¶¶ 37-39 (marital settlement agreement unconscionable where husband did not disclose actual value of marital and personal assets).

¶ 102    The record shows that David failed to disclose assets fully during the negotiations and may have let Jane believe the couple had outstanding liabilities. We know that during the hearing to enforce the agreement and before this court, David made false statements about his liabilities. He presented Exhibit 10 in the trial court, and then his counsel reproduced it in his reply brief before us. Exhibit 10 lists numerous loans David claims he had to take out to pay off Jane. The trial court declined to admit Exhibit 10 into evidence. But in the reply brief, his attorney makes it appear that the trial court allowed admission of Exhibit 10 and considered it in ruling. After pointed questioning from the justices during oral arguments, David's counsel admitted that the parties did not have any liabilities when entering into the postnuptial agreement. (Justices rarely question the appellee's attorney during the appellant's attorney's rebuttal.)

¶ 103    Also, David's disclosure of the value of his stock options raises questions about his honesty and the options' true worth. David texted Jane that the stock options had a value of $2.3 million and later told her they were worthless. The majority concludes that the trial court "had no evidence to assist in its valuation, if any, of the stock options." Not so. The trial court had two pieces of evidence, a text from David that the stock options were worth $2.3 million and his later testimony that they were worthless. As with its other findings of fact, the trial court could have made a finding as to which statement was more credible. Still, David's conflicting statements about the value of an enormous and significant marital asset convey deception.

¶ 104                          VII. Understanding of Terms

¶ 105    As the majority acknowledges, Jane understood that David's agreement allocated more assets to David but did not understand the disparity's extent. Jane testified that David bombarded her with different charts and splits of the marital estate almost daily from July-August 2017. David showed Jane balance sheets that indicated she would receive about 45% of the marital assets. As we know, the balance sheets contained false information. David also falsely told Jane that he would always take care of her financially and would pay the children's expenses.

¶ 106                           VIII. Length of Marriage

¶ 107    Courts routinely look to the length of a marriage in assessing the appropriateness of a maintenance award. Section 504(b-1)(1)(B) of the Illinois Marriage and Dissolution of

Marriage Act provides multiplying factors based on the duration of the marriage and states that for "a marriage of 20 or more years, the court, in its discretion, shall order maintenance for a period equal to the length of the marriage or for an indefinite term." 750 ILCS 5/504(b-1)(1)(B) (West 2020).

¶ 108    This court has held that "[i]ndefinite or permanent maintenance is appropriate in cases where the recipient spouse 'devoted significant time to raising a family in lieu of pursuing a career' " (*In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 110 (quoting *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 652 (2008))) and "where the recipient spouse is not employable at an income level sufficient to enable [him or] her to live at the standard of living that was established during the marriage" (*id.* (citing *In re Marriage of Harms*, 2018 IL App (5th) 160472, ¶ 45)).

¶ 109    The length of the marriage, especially when viewed in light of a disparity in the parties' earning power and the division of marital assets, presents a significant factor in assessing unconscionability. For instance, in *Callahan*, to support its finding of unconscionability, the trial court noted that the parties had been married for 29 years and the wife had stayed home to raise the parties' child, had not worked for 25 years, and received about 11% of the marital estate. *Callahan*, 2013 IL App (1st) 113751, ¶¶ 5-7. Similarly, Jane and David were married for 23 years, during which time Jane was a housewife and stay-at-home mother. As noted, her earning capacity was far below David's, yet Jane received about 25% of the marital assets and much less, depending on the value of David's stock options.

¶ 110                          IX. Physical or Emotional Abuse

¶ 111    Evidence of physical or emotional abuse during a marriage raises the question of whether the agreement was entered freely. See *Reich v. Reich*, 657 N.Y.S.2d 671, 672 (App. Div. 1997) (affidavits of wife and other witnesses were sufficient to raise issue on whether postnuptial agreement was result of wife's mental disability attributable to husband's overreaching, including physical abuse). Jane said David never "touched her in anger." But she also testified that David's history of verbal and emotional abuse "trained" her to know what would happen if she crossed him. Jane described her main goals as protecting her relationship with the children and living away from David and his constant control.

¶ 112    Jane's text messages repeatedly refer to David as controlling. Marks testified that Jane said she had no choice because she needed to get away from David's control. Further, David bombarded Jane with financial information and repeatedly sent her text messages badgering her to sign the postnuptial agreement as written, all of which demonstrates overreaching.

¶ 113    David knew Jane desperately wanted out of the marriage. The majority asserts she was looking for a "fresh start," a mischaracterization of Jane's testimony that she wanted to get out from under David's abusive control.

¶ 114                          X. Disparity in Allocation of Assets

¶ 115    In determining whether an agreement is substantively unconscionable, a court considers the terms and the parties' resulting economic circumstances. For instance, in *Richardson*, this court found that a settlement agreement granting the wife only 7.55% of assets was unconscionable. *Richardson*, 237 Ill. App. 3d at 1083. Similarly, in *Callahan*, this court found the marital settlement agreement substantively unconscionable. There, the wife, after being a

stay-at-home mother for 29 years, received nonmodifiable maintenance covering just living expenses—totaling $175,000 for her entire life. The husband retained the entire marital estate worth $1.5 million. *Callahan*, 2013 IL App (1st) 113751, ¶¶ 22-23.

¶ 116   As in *Richardson* and *Callahan*, the asset allocation deprived Jane of a fair share of the marital estate, valued at about $3.8 million, not including the $2.3 million stock options. Accordingly, the total value of the marital estate could be as much as $6.25 million, from which Jane received only $576,866 (after excluding the $246,713 in her children's UTMA accounts). That amounts to about 9.7% of the marital assets. Excluding the stock options, Jane received 25% of the marital assets after 23 years of marriage. Again, David insisted that Jane stay home to raise the children and take care of household responsibilities.

¶ 117   The trial court acknowledged the allocation of assets was unfair to Jane but decided that because Jane was "smart," "knew what she wanted," and "got what she wanted"—out of the marriage—it was not unconscionable. But still, as discussed, Jane's desire to end the marriage is irrelevant to assessing the agreement's validity. Indeed, the evidence shows David used her strong desire to get away from his control to procure terms most favorable to him.

¶ 118                              C. Weighing the Factors

¶ 119   The majority concludes that Jane "chose" not to have an attorney represent her. The opposite is true. Through threats, pressure, and manipulation, David prevented Jane from retaining an independent attorney of her choosing. Further, the record contains abundant evidence of other forms of duress, which the majority minimizes; for example, Jane wanted to end the marriage to free herself from David's manipulation and control. Other factors not considered by the majority—including the disparity in earning power, full disclosure of assets and liabilities, and the length of the marriage—support a finding of unconscionability.

¶ 120   Lastly, as the majority acknowledges, David controlled the parties' finances. Using his superior knowledge and misrepresentations regarding nonexistent liabilities, David drafted an agreement that allocates most of the marital assets to him. In doing so, he deceived Jane about their financial position, including the value of his stock options.

¶ 121   Weighing all of the factors, I conclude that enforcing the postnuptial agreement constitutes both procedural and substantive unconscionability and must be reversed.

¶ 122                         D. Attorney's Misrepresentations

¶ 123   Separately, I want to address misrepresentations by David's attorney, Kurt Richter, in the trial court, appellate brief, and oral argument. The majority notes that David claimed he incurred liabilities after the agreement that should be relevant to the parties' economic circumstances. The majority acknowledged that David and his attorney did not present documentary evidence in the trial court or before this court to corroborate that claim. And, citing Illinois Supreme Court Rule 341 (eff. May 25, 2018) governing briefs, the majority opts not to consider this contention.

¶ 124   The misrepresentations by Richter and his client involve far more egregious conduct than the majority recognizes.

¶ 125   The trial court refused to admit into evidence a "Net Worth Balance Sheet" (marked as Exhibit 10). But that did not stop Richter from reproducing the document in his brief before us, along with this explanation, "The court examined the resulting Net Worth Balance Sheet

and there was substantial testimony regarding the various items on the balance sheet. The testimony nor the court's ruling indicated there were any misstatements nor omissions on the Net Worth Balance Sheet."

¶ 126    Quite the reverse, when pressed amid rebuttal at oral argument, Richter had to admit that all of the liabilities in the document were fictitious. The parties had no liabilities—none whatsoever—when they entered the postnuptial agreement. Nevertheless, according to Exhibit 10, Jane received a higher percentage of marital assets to liabilities. Before the trial court and this court, there was a dual purpose for Exhibit 10—(i) to make the courts rely on the document and (ii) to give credence to David's contention Jane received a higher percentage of marital assets to liabilities.

¶ 127    Richter accepted no personal responsibility, telling us his client created Exhibit 10 and wanted it included in the appellate brief.

¶ 128    Richter has not absolved himself under Illinois Rules of Professional Conduct 3.3(a)(1) or (a)(3). See Ill. R. Prof'l Conduct (2010) R. 3.3(a)(1), (3) (eff. Jan. 1, 2010). Rule 3.3(a)(1) states: "A lawyer shall not knowingly *** make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer ***." Ill. R. Prof'l Conduct (2010) R. 3.3(a)(1) (eff. Jan. 1, 2010).

¶ 129    Rule 3.3(a)(3) prohibits a lawyer from "offer[ing] evidence that the lawyer knows to be false." Ill. R. Prof'l Conduct (2010) R. 3.3(a)(3) (eff. Jan. 1, 2010). It also imposes a duty on the lawyer: if he or she knows that a lawyer, client, or witness "has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal." It further permits the lawyer to refuse to offer evidence he or she reasonably believes is false. *Id.*

¶ 130    The document involves a material issue: the parties' assets and liabilities. And, as he admitted during oral argument, Richter knew the document to be false, which required him to take remedial measures, including refusing to offer the document into evidence or disclosing its deceit. Instead, Richter attempted to present false information to two tribunals.

¶ 131    Further, that is not his only falsehood. In his brief, Richter states that the parties negotiated "with the guidance and advice of their respective attorneys for months prior to signing." It is undisputed that Jane was not represented by an attorney during negotiations and never had legal representation. See *supra* ¶ 9. Nonetheless, Richter states that Jane received "substantial guidance and advice" while acknowledging that Marks asked for minor edits and renaming the agreement. If, as everyone agrees, Marks told Jane not to sign because it was unfair, would Marks not, if he provided "substantial guidance and advice," have sought substantive changes?

¶ 132    Richter also makes assertions not found in the appellate record in violation of Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018). For instance, he states that the trial court found that Jane "initiated" and "insisted" on entering David's agreement. A search of the record revealed nothing indicating that Jane so initiated or so insisted. Also, David's brief states that Jane had full access to the parties' bank and investment accounts and asserts that Jane said she thought the agreement was equitable. Again, nothing in the record supports either assertion. Jane testified that she did not have access to all the accounts and she did not understand either the split of assets or that she would be receiving a disproportional amount of the marital estate.

¶ 133     In short, Richter's conduct warrants consideration by the Illinois Attorney Registration and Disciplinary Commission.