NOTICE
Decision filed 10/28/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230288-U

NO. 5-23-0288

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| JEANETTE LYNN CHAMBERLAIN, | ) | Union County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 21-D-32 |
| | ) | |
| GERALD ALLEN CHAMBERLAIN, | ) | Honorable |
| | ) | Timothy D. Denny, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1   *Held*: Where the trial court's finding that the postnuptial agreement was procedurally and substantively unconscionable was not contrary to the manifest weight of the evidence, we affirm. Where the court concluded that the postnuptial agreement was unenforceable because Jeanette Lynn Chamberlain violated numerous provisions of the agreement, and that these findings were not contrary to the manifest weight of the evidence, we affirm. Where the trial court did not consider statutory factors classifying Gerald Allen Chamberlain's property settlement as maintenance, we reverse this portion of the order and remand. Where the trial court did not abuse its discretion in dividing the marital assets, we affirm.

¶ 2   In this dissolution of marriage case, the trial court concluded that the postnuptial agreement between the parties was unconscionable, ordered a distribution of the marital assets, ordered Jeanette Lynn Chamberlain (Jeanette) to pay Gerald Allen Chamberlain (Gerald) two separate amounts ($78,550 and $6351.66) for his interest in marital assets, and classified the payments as

1

maintenance to preclude Jeanette from discharging this obligation in any future bankruptcy. Jeanette appeals. We affirm the trial court's ruling regarding unconscionability of the postnuptial agreement and the equitable distribution of marital assets; however, we reverse the trial court's classification of the distribution of marital assets as "maintenance" and remand for further proceedings.

¶ 3                                          I. BACKGROUND

¶ 4       After 40 years of marriage, Jeanette and Gerald were divorced on March 29, 2023. Early in the marriage, they purchased 15 acres of land in Stonefort. In 1997, they made improvements to the land by adding a home and garage which became their marital residence.

¶ 5       Gerald suffered a work-injury followed by a stroke that rendered him a paraplegic. He was provided with disability benefits from his employer and was also awarded Social Security Administration disability benefits.

¶ 6       In January 2005, the parties jointly entered into a debt consolidation loan secured by a mortgage on the marital residence in the amount of $90,000. In 2005, the marital residence was appraised at $121,000.

¶ 7       Jeanette filed a petition for divorce in Saline County on October 31, 2011; the parties lived separate and apart beginning on September 12, 2011. Gerald lived in Texas and retained an Illinois attorney to represent him in the divorce case.

¶ 8       While in Texas, Gerald suffered another stroke that resulted in additional neurological damage, because of which he became a quadriplegic and entered a nursing home in Texas for appropriate care. Gerald became quite distressed living in the nursing home. He reached out repeatedly to Jeanette asking her to reconcile and allow him to return to their marital residence. Ultimately, Jeanette acquiesced, with the requirements that Gerald execute a quitclaim deed to the

marital residence, sign a postnuptial agreement, and execute new healthcare and property powers of attorney naming Jeanette as his attorney-in-fact.

¶ 9    Jeanette had her divorce attorney draft a postnuptial agreement. As consideration, Jeanette agreed to dismiss the pending Saline County divorce case, and to provide care for Gerald at the marital residence. Gerald quitclaimed his interest in the marital residence to Jeanette. The agreement stated that "[b]oth parties confirm that they are entering into this contract at their own free will and are under no form of duress, coercion, or mental disability." Most importantly, in the event of separation or divorce, Jeanette would keep the marital residence, a 2004 GMC pickup truck, a bass tender boat with related items, all manual and power tools, including a four-wheeler, and all household furnishings not specifically awarded to Gerald. Gerald was given certain pieces of furniture and a refrigerator. Each party would retain his or her own bank accounts and debts. Gerald and Jeanette were each responsible for one-half of 2010 and 2011 federal income taxes. Gerald would keep Jeanette on his health insurance, and she would pay him the costs associated with this coverage. Any debt incurred after the postnuptial agreement was executed would be joint in nature. Jeanette was given the responsibility to handle all financial affairs for both parties. Any property obtained after the postnuptial agreement was executed would be held jointly and subject to equitable division by the court in the event of separation or divorce.

¶ 10    Gerald signed the postnuptial agreement, quitclaim deed, and powers of attorney before a Texas notary public on October 10, 2012. Jeanette signed the postnuptial agreement before an Illinois notary public on October 20, 2012. Gerald did not consult with the attorney representing him in the Saline County divorce petition nor with any attorney in Texas before executing the postnuptial agreement. The Saline County divorce case was dismissed on November 21, 2012.

¶ 11 Gerald returned to the marital residence later in 2012. He was dependent upon caregivers for most of his needs. The caregivers were paid by the Illinois Division of Rehabilitation Services (DORS).

¶ 12 In October 2020, using the marital residence as collateral, Jeanette borrowed $40,000 resulting in a mortgage on the marital residence, which was then appraised at $157,100. Jeanette signed Gerald's name on the loan documents as his attorney in fact. At closing, she paid off the balance of the 2005 mortgage[1] and received $12,703.31 in cash.

¶ 13 Gerald contended that Jeanette was not keeping him updated on any financial matters. He inquired about a COVID-19 stimulus payment in March 2021 totaling $2800. Gerald asked where his money "was going," and allegedly Jeanette informed him that his money was going toward the mortgage on the property. Gerald also made complaints about the level of his care, alleging that his requests to see a lawyer and a dentist were denied because of a lack of funds. Gerald also alleged that his requests to be taken to the local hospital emergency room for medical evaluation and treatment were denied.

¶ 14 In July 2021, Gerald left the marital residence and ended up at the Illinois Veterans' Home in Anna. He revoked the powers of attorney and gained access to his bank account. He learned that his monthly disability income of $2237 had been transferred into Jeanette's bank account. Gerald testified that he never authorized the transfer of his money into Jeanette's account.

¶ 15 On July 14, 2021, Jeanette filed her petition for dissolution of marriage, asking the trial court to make the postnuptial agreement and the quitclaim deed part of the judgment of dissolution of marriage. The case went to trial on March 13, 2023. The trial court entered an order on March 29, 2023, dissolving the marriage. The trial court ruled that the postnuptial agreement was

---

[1]The 2005 mortgage was a debt consolidation mortgage for $90,000.

procedurally and substantively unconscionable because when Gerald executed the document, he was not likely cognitively capable of doing so and was under duress. The court noted that Gerald was a quadriplegic living in a nursing home in Texas and was presented with no options other than to execute both the quitclaim deed and the postnuptial agreement. The court noted that the effect of the postnuptial agreement was to provide Jeanette with "complete control of all the assets, all the income, and even physical control of [Gerald's] person."

¶ 16    The court also noted that Jeanette violated several paragraphs of the postnuptial agreement: (1) paragraph 12(a) by comingling the parties' funds which were utilized for financial matters associated with the marital residence; (2) paragraph 13 by taking out a mortgage in both names against the marital residence on October 9, 2020, utilizing her power of attorney for Gerald's property, and violating her fiduciary duty to Gerald; (3) paragraph 14 by failing to keep Gerald informed of the parties' financial affairs; and (4) paragraph 15—any property obtained after the date of the agreement would be joint and subject to an equitable division—was violated with Jeanette's actions referenced in paragraphs 12(a) and 13.

¶ 17    The trial court set aside the postnuptial agreement and the quitclaim deed. Based upon the most recent real estate appraisal of the marital residence at $157,100, the trial court ordered Jeanette to pay Gerald $78,550 for his one-half interest. In addition, Jeanette was ordered to pay Gerald one-half of the cash payout on the October 9, 2020, mortgage taken out on the marital residence—$6351.66. The trial court also stated that the property awarded to Gerald "shall be deemed in the nature of maintenance and not dischargeable in bankruptcy." Jeanette filed a timely appeal.

5

¶ 18                                    II. ANALYSIS

¶ 19    On appeal, Jeanette argues that the postnuptial agreement was not unconscionable; that the trial court's order finding that her payments to Gerald would be construed as maintenance was improper; and that the trial court's property award of $78,550 for Gerald's interest in the marital residence and $6351.66 as his share of the cashed-out portion of the 2020 mortgage were erroneous.

¶ 20                              A. Postnuptial Agreement

¶ 21    We first address the postnuptial agreement. Whether a postnuptial agreement is unconscionable presents a question of law which we review *de novo*. *In re Marriage of Prill*, 2021 IL App (1st) 200516 ¶ 15 (citing *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 99 (2006)). We must review the trial court's factual findings using the manifest weight of the evidence standard and will only reverse that decision if the opposite conclusion is clearly evident. *Id.* (citing *Kranzler v. Kranzler*, 2018 IL App (1st) 171169, ¶ 39).

¶ 22    "A trial court may make a finding of unconscionability based on procedural unconscionability, substantive unconscionability, or some combination of the two." *In re Marriage of Tabassum*, 377 Ill. App. 3d 761, 774-75 (2007); see also *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 21 (2006). Therefore, on review, the court can affirm the trial court's unconscionability finding on just one of the grounds.

¶ 23    Before we begin the analysis of whether the agreement was unconscionable, we note the consideration Jeanette offered in exchange for Gerald's execution of the postnuptial agreement and the quitclaim deed. Jeanette agreed to "provide care" to Gerald. There was no evidence in this case that Jeanette directly provided any care for Gerald. Instead, the parties' daughter, Courtney Page, provided some care, while at least 10 other personal care attendants paid by DORS provided

6

services for Gerald including cooking meals, helping Gerald with showers, transferring him to use the bathroom and in and out of bed, and other activities of daily living. At times, Courtney was also paid by DORS.

¶ 24                              1. *Procedural Unconscionability*

¶ 25    Procedural unconscionability depends upon the specific facts of the case and "typically deals with significant improprieties during the formation of the agreement that deprive a party of a meaningful choice." *Marriage of Prill*, 2021 IL App (1st) 200516, ¶ 19. "Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power." *Razor*, 222 Ill. 2d at 100. The trial court must consider two factors in determining if the agreement was procedurally unconscionable: (1) the circumstances and conditions under which the agreement was made; and (2) the economic circumstances of the parties that result from the agreement. *In re Marriage of Bielawski*, 328 Ill. App. 3d 243, 251 (2002). One possible impropriety is duress, which " 'includes oppression, undue influence, or taking undue advantage of the stress of another to the point where another is deprived of the exercise of free will.' " *Marriage of Prill*, 2021 IL App (1st) 200516, ¶ 19 (quoting *In re Marriage of Richardson*, 237 Ill. App. 3d 1067, 1082 (1992)); *Marriage of Tabassum*, 377 Ill. App. 3d at 775 (citing *Marriage of Richardson*, 237 Ill. App. 3d at 1082).

¶ 26    Here, the trial court concluded that the postnuptial agreement and the other documents signed in Texas were unenforceable due to procedural unconscionability, finding:

"At the time of the execution of the agreement, Respondent [Gerald] was a quadriplegic, living in a nursing home in Texas, with no other option. Evidence the Respondent was cognitively capable of entering into said agreement is tenuous at best. The Court finds it

7

difficult to imagine a scenario where one could have been under more duress than the Respondent under the circumstances."

From the facts in this case, Gerald suffered a stroke while in Illinois and then suffered a more severe stroke while in Texas resulting in his placement in a hospital for one month followed by a nursing home facility. Gerald had severe mobility impairments. During the trial, Jeanette confirmed that Gerald was in distress while he was in the nursing home and desperately wanted to reconcile. She testified that Gerald begged her to come home and wanted her to drop the divorce case.

¶ 27    In addition to Gerald's distress while in the nursing facility, he also did not consult with an attorney in Texas before signing the documents. He also failed to have his Illinois divorce attorney review them before he signed. Gerald testified that he had no opportunity to review the documents before he was presented with them at the Texas nursing home. We find this case factually similar to *Marriage of Richardson* in which the appellate court concluded that the postmarital agreement was unconscionable due to distress because the wife was not represented by counsel when the first draft was written, and although her husband's coworker represented her later, this attorney never met with or discussed the agreement with her, she did not see the agreement until she signed it, and she signed the agreement one week after the death of her father, an event that took an emotional toll on her. *Richardson*, 237 Ill. App. 3d at 1074, 1081-82.

¶ 28    We conclude that the trial court's factual findings regarding procedural unconscionability were not contrary to the manifest weight of the evidence, and we affirm this portion of the trial court's order. *Marriage of Prill*, 2021 IL App (1st) 200516 ¶ 15 (citing *Razor*, 222 Ill. 2d at 99).

¶ 29             2. *Substantive Unconscionability*

¶ 30    "A contract is unconscionable when it is improvident, oppressive, or totally one-sided [citation], but mere disparity of bargaining power is not sufficient grounds to vitiate contractual obligations [citation]." *Streams Sports Club, Ltd. v. Richmond*, 99 Ill. 2d 182, 191 (1983) (citing *Walter E. Heller & Co. v. Convalescent Home*, 49 Ill. App. 3d 213, 219 (1977), and *First Financial Insurance Co. v. Purolator Security, Inc.*, 69 Ill. App. 3d 413, 419 (1979)). In *Razor*, the Illinois Supreme Court noted that "[s]ubstantive unconscionability refers to those terms which are inordinately one-sided in one party's favor." *Razor*, 222 Ill. 2d at 100. "The inquiry into unconscionability requires two distinct considerations: (1) the conditions under which the agreement was made; and (2) the economic circumstances of the parties resulting from the agreement." *In re Marriage of Smith*, 164 Ill. App. 3d 1011, 1017 (1987) (citing *In re Marriage of Foster*, 115 Ill. App. 3d 969, 972 (1983)). To determine if the economic positions of the parties are unconscionable, "courts employ commercial concepts of unconscionability: an absence of a meaningful choice on the part of one of the parties combined with terms unreasonably favorable to the other party." *Id.* (citing *Marriage of Foster*, 115 Ill. App. 3d at 972-73).

¶ 31    Here, the trial court found that the postnuptial agreement was also substantively unconscionable, stating:

> "In balancing the effect of the agreement as executed by the Petitioner, the end result would be that the Petitioner has complete control of *all the assets*, all the income, and even physical control of the Respondent's person. Viewing the equitable balance between the parties created by the agreement it can only be determined that there was no equitable balance. Again, it is difficult to imagine a scenario where the Petitioner could have been given a greater share of the pie and Respondent less." (Emphasis added.)

9

¶ 32　　We first review the conditions under which the agreement was entered in this case. Although Gerald was represented by a divorce attorney in Illinois, there was no evidence that this attorney reviewed and/or sent the documents to Gerald beforehand. Gerald never saw the agreement until he signed it in Texas. Jeanette testified that because Gerald called her more than once to ask when the documents would be ready, Gerald knew and agreed to their content. Contrary to Jeanette's argument, we find that the facts establish that Gerald was under extreme distress in the Texas nursing home with no one to assist or advocate for him.

¶ 33　　We next turn to the economic circumstances of the parties. As the trial court noted, when Gerald signed the documents, Jeanette became the owner of the marital residence and had complete control over Gerald's income. Upon his return from Texas, Gerald had no access to his income and was prevented access to information concerning it. While the postnuptial agreement listed items of used furniture and a refrigerator that Gerald would keep upon a dissolution of marriage, all other household furnishings, a vehicle, a boat, and power equipment, in addition to the marital residence, were designated to go to Jeanette. We agree with the trial court's assessment that the terms of the postnuptial agreement were completely one-sided in favor of Jeanette with no equitable balance. We conclude that the trial court's ruling that the postnuptial agreement was substantively unconscionable was not contrary to the manifest weight of the evidence. *In re Marriage of Miller*, 98 Ill. App. 3d 1084, 1088 (1981).

¶ 34　　3. Unenforceability Due to Violation of Terms of the Postnuptial Agreement

¶ 35　　With a postnuptial agreement or other type of settlement agreement, courts interpret the provisions by normal contract rules. *In re Marriage of Thaden*, 119 Ill. App. 3d 538, 540 (1983). The trial court determines if a contract exists, its terms, and the parties' intent. *Peoria Harbor Marina v. McGlasson*, 105 Ill. App. 3d 723, 727 (1982). The elements of an enforceable contract

10

are (1) offer and acceptance, (2) definite and certain terms, (3) consideration, and (4) performance of all required conditions. *Zirp-Burnham, LLC v. E. Terrell Associates*, 356 Ill. App. 3d 590, 600 (2005). Consideration is defined as a bargained-for exchange of promises or performance. *Village of South Elgin v. Waste Management of Illinois, Inc.*, 348 Ill. App. 3d 929, 940 (2004).

¶ 36    A substantial or material breach of the contract may terminate the contract. *First National Bank of Evergreen Park v. Chrysler Realty Corp.*, 168 Ill. App. 3d 784, 793 (1988). "The test is whether the breach is so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *Id.* (citing *Wright v. Douglas Furniture Corp.*, 98 Ill. App. 2d 137, 143 (1968)).

¶ 37    As this was a bench-tried case, the trial judge was required to weigh the evidence and make findings of fact. *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 483-84 (2002) (citing *Hendricks v. Riverway Harbor Service St. Louis, Inc.*, 314 Ill. App. 3d 800, 807 (2000)). "The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008*); Jackson v. Bowers*, 314 Ill. App. 3d 813, 818 (2000). " 'A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.' " *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859 (quoting *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001)); *Comm v. Goodman*, 6 Ill. App. 3d 847, 853 (1972). "As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony." *Chicago's Pizza, Inc.*, 384 Ill. App. 3d at 859. Furthermore, the trier of fact is in a better position to resolve any conflicts in the testimony and draw inferences from the facts. *People*

11

*v. Gray*, 2017 IL 120958, ¶ 35; *People v. Bradford*, 2016 IL 118674, ¶ 12. Therefore, we will not substitute our judgment for that of the trial court on questions involving the weight of the evidence or the credibility of the witnesses. *Gray*, 2017 IL 120958, ¶ 35; *Bradford*, 2016 IL 118674, ¶ 12.

¶ 38     After the trial court heard the testimony of the parties and their daughter and assessed their credibility, it found that Jeanette violated the following paragraphs of the postnuptial agreement: 12(a), 13, 14, and 15.

¶ 39     Paragraph 12(a) of the postnuptial agreement obligated Jeanette to be responsible for all financial matters associated with the marital residence after Gerald signed the quitclaim deed. The trial court found that Jeanette violated this subsection because she comingled Gerald's funds with her own, and then used those funds to pay bills related to the marital residence. Testimony and documentary evidence established that after Gerald received his monthly benefits each month, Jeanette transferred those funds to her bank account. This bank account was used to pay marital resident-related bills. While Jeanette testified that she used the money transferred from Gerald's account to pay for his personal and health-related bills, the trial court did not find Jeanette's testimony to be compelling, noting in its judgment entry that she comingled "the parties' funds which were utilized for financial matters associated with said mobile home and real estate." Having reviewed the record on appeal, and considering our deference to the trial court's judgment, we agree with the court's decision. *Gray*, 2017 IL 120958, ¶ 35; *Bradford*, 2016 IL 118674, ¶ 12.

¶ 40     Paragraph 13 of the postnuptial agreement stated: "Any debt or loan obtained after the execution of this Agreement shall be considered as joint debt with liability resting on both parties. However, Gerald *** shall be solely responsible for his medical bills." Jeanette took out a mortgage on the marital residence in both parties' names by using her power of attorney over property to obligate Gerald on this loan. While the loan Jeanette secured in both names does not

12

seem to violate paragraph 13, the trial court's judgment order found that Jeanette violated the fiduciary duty she owed Gerald pursuant to the power of attorney over property he executed, and by violating the fiduciary duty, she violated paragraph 13. We agree with the trial court.

¶ 41　Paragraph 14 of the postnuptial agreement obligated Jeanette to keep Gerald informed of how she managed his financial affairs. Gerald testified that he was not informed about financial matters. He also testified that he asked for a telephone, asked to speak to an attorney, and asked to have a dental appointment, but his requests were rejected allegedly because there was insufficient money to pay for a phone or for these services. Having reviewed the record on appeal, we find that there was adequate testimony supporting the court's conclusion that Jeanette failed to keep Gerald informed of the management of the financial affairs. Moreover, we defer to the trial court's judgment and agree with its conclusion.

¶ 42　Finally, the trial court concluded that Jeanette violated paragraph 15 of the postnuptial agreement, which stated: "Any property obtained after execution of this Agreement shall be joint property and shall be subject to an equitable division by the court in the event of separation of divorce. Joint property excludes any purchases made utilizing funds from the assets that have been classified as separate property." The court held that Jeanette violated this paragraph "by her actions in paragraphs 12 and 13." We defer to the trial court's judgment and find support in the record for its ruling.

¶ 43　　　　　　　　　　　　　　B. Maintenance

¶ 44　We next turn to the issue of the trial court's classification of Gerald's property settlement as maintenance. Jeanette argues that the trial court's order was in error because the court failed to conduct the analysis required by section 504 of the Illinois Marriage and Dissolution of Marriage Act. 750 ILCS 5/504 (West 2020).

13

¶ 45    "The propriety of a maintenance award is within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." *In re Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 3. An abuse of discretion will only be found if no reasonable person would accept the view adopted by the trial court. *Id.* (citing *In re Marriage of O'Brien*, 2011 IL 109039, ¶ 52, and *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005)). If "a party challenges a trial court's factual findings regarding a maintenance determination, this court will not reverse a trial court's findings unless the findings are against the manifest weight of the evidence." *Id.* The trial court may make a maintenance award only after consideration of the statutory factors. *Id.* ¶ 9. Those factors include the income and property of each party including marital and nonmarital properties; each parties' needs; the present and future earning capacity of each party; any impairment of the realistic future earning capacity of the party against whom maintenance is sought; the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment; the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment; the standard of living established during the marriage; the duration of the marriage; the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties; the tax consequences to each party; contributions and services by the party seeking maintenance to the other party's education, training, career or career potential, or licensure of the other spouse; any valid agreement between the parties; and any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2020).

¶ 46    Here, the trial court's order lacked any consideration of the section 504(a) statutory factors necessary for a maintenance award. *Marriage of Sturm*, 2012 IL App (4th) 110559, ¶ 9. We conclude that the trial court's classification of Gerald's property division award as maintenance

14

constitutes an abuse of discretion. *Id. ¶* 3. We reverse the maintenance-related order and remand for further proceedings consistent with this order.

¶ 47                                C. Property Division

¶ 48    We finally turn to the trial court's property division. Jeanette contends that the trial court erred in awarding Gerald $78,550 for his interest in the marital residence, and by awarding him $6351.66 as his share of the excess funds Jeanette received in October 2020 when she mortgaged the marital residence.

¶ 49    Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act requires marital property division in just proportions without regard to marital misconduct. 750 ILCS 5/503(d) (West 2020). Proportional asset division does not require mathematical equality. *In re Marriage of Doty*, 255 Ill. App. 3d 1087, 1097-98 (1994). The trial court may award an unequal distribution of property if it properly applies the section 503(d) guidelines. *Id.* The guidelines to be considered in determining a marital property division include the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or nonmarital property; dissipation of each party to marital property; the value of property assigned to each spouse; the duration of the marriage; the relevant economic circumstances of each spouse when the division of property is to become effective; any obligations and rights arising from a prior marriage of either party; any prenuptial or postnuptial agreement of the parties; the age, health, station, occupation, amount and sources of income, vocational skills, employability estate, liabilities, and needs of each of the parties; the custodial provisions for any children; whether the apportionment is in lieu of or in addition to maintenance; the reasonable opportunity of each spouse for future acquisition of capital assets and income; and the tax consequences of the property division on each party. 750 ILCS 5/503(d)(1)-(12) (West 2020).

¶ 50     The trial court's determination relative to property division is only constrained by reason and will not be overturned unless it can be shown that the trial court abused its discretion. *In re Marriage of Siddens*, 225 Ill. App. 3d 496, 500 (1992). The issue for the reviewing court is not whether it necessarily agrees with the trial court's determination as to marital asset division, but whether the trial court acted arbitrarily without employing conscientious judgment, or if in view of all circumstances of the case, the trial court exceeded the bounds of reason so that no reasonable person would follow the trial court's position. *Id.*

¶ 51     After the trial court set aside the postnuptial agreement and the quitclaim deed, both Jeanette and Gerald shared joint ownership of the marital estate. The estate included the marital residence, a truck, a boat, numerous power tools, and Jeanette's 401(k) plan through her employment with Walmart, as well as all other personal property accumulated during the marriage. Evidence established that both parties had similar income, had contributed to the marital estate, and were close in age. In 2020, Jeanette set the value of a 2004 truck at $8000. In 2020, the marital residence was appraised at $157,100, when Jeanette and Gerald, via Jeanette's use of the power of attorney over property, took out a mortgage on the property.

¶ 52     The trial court awarded Gerald half of the 2020 value of the marital residence—$78,550 and ordered Jeanette to pay Gerald one-half of the cash payout Jeanette received in 2020 when she mortgaged the marital residence—$6351.66. Jeanette was awarded sole ownership of her 401(k) account—$12,741. Jeanette received most of the personal property, including the 2004 truck, the boat, all power tools, and furniture. The court awarded Gerald limited items of personal property.

¶ 53     Jeanette argues that the trial court's order that she pay Gerald one-half of the cash payout from the mortgage amounts to a finding of dissipation. We disagree. Gerald did not file a notice of intent to claim dissipation (750 ILCS 5/503(d)(2)(i) (West 2020)), and the court did not make a

16

finding that Jeanette dissipated the funds. However, the court found that Jeanette breached her fiduciary duty to Gerald and encumbered his interest in the marital residence by using the power of attorney he granted her and adding his name to the 2020 mortgage. Thus, the trial court's award of one-half of the cash payout to Gerald was premised on Jeanette's breach of the fiduciary duty she owed Gerald.

¶ 54    Jeanette also argues that the trial court should use the net equity in the house for the division of the marital residence. She argues that the division of the $157,100 value of the marital residence should be reduced by the $40,000 mortgage that she took out on the property in 2020. Thus, she contends that Gerald should have only been awarded $58,550 for his share of the marital residence, instead of $78,550.

¶ 55    We are reminded that division of marital property does not need to be precisely even. *Marriage of Doty*, 255 Ill. App. 3d at 1097-98. Further, "[w]hile a trial court must consider all relevant factors before exercising its discretion in distributing marital property, it need not make specific findings as to each of the factors set forth in section 503(d)." *In re Marriage of Benz*, 165 Ill. App. 3d 273, 288 (1988) (citing *In re Marriage of Guntren*, 141 Ill. App. 3d 1, 5-6 (1986)). In consideration of the unique facts of this case and the trial court's division of the assets, we do not find that the property division was inequitable. In addition to the division of the marital residence and the cash Jeanette received from the 2020 mortgage, Jeanette received her 401(k), the truck, the boat, and most of the personal property. In contrast, in addition to the equal split of the value of the marital residence and one-half of the cash proceeds of the 2020 mortgage, Gerald only received very few items of personal property. We conclude that the trial court did not abuse its discretion. *Marriage of Siddens*, 225 Ill. App. 3d at 500.

17

¶ 56                                    III. CONCLUSION

¶ 57    For the reasons stated above, we conclude that the trial court's March 29, 2023, order is affirmed in part and reversed in part. We affirm the court's findings that the postnuptial agreement was procedurally and substantively unconscionable, and that the agreement was also unenforceable because Jeanette violated several of its terms. We also affirm the court's division of marital property. We reverse the trial court's order finding that Gerald's share of the marital assets shall be construed as maintenance and remand this case for further proceedings consistent with this order.

¶ 58    Affirmed in part and reversed in part; cause remanded.